UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA STARK,<br><br>　　　　　　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>NOTEWORTHY COMPANY and NOTEWORTHY INDUSTRIES, INC.,<br><br>　　　　　　　　　　　　　　Defendants. | **Complaint**<br><br>**Jury Trial Demanded**<br><br>Case No.<br>6:15-CV-0120 (MAD/TWD) |

　　　　Plaintiff, Lisa Stark, by her attorneys, Cooper Erving & Savage LLP, as and for her complaint herein, respectfully alleges as follows:

### INTRODUCTION AND JURISDICTIONAL STATEMENT

1.　　This is an action alleging discrimination in employment and retaliation in violation of 42 U.S.C. §§ 2000e-2, *et seq*. ["Title VII"] and New York State Executive Law §§ 290, *et seq*. ["the Human Rights Law"].

2.　　The jurisdiction of the Court is invoked pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1331.

3.　　Plaintiff asserts that the claims under New York State law arise from the same set of facts and circumstances as are claimed under Title VII. Thus, the jurisdiction of this Court is also invoked pursuant to the doctrine of pendent jurisdiction and 28 U.S.C. § 1367 (supplemental jurisdiction).

4.　　Plaintiff demands a jury trial of this action.

5.　　Lisa Stark filed a complaint with the Equal Opportunity Employment Commission ["EEOC"] on or about December 19, 2012 in which she alleged, *inter alia*, that she had been

1

discriminated against at her place of employment on the basis of sex, and, more specifically, that she had been the victim of sexual harassment, including unwelcome physical contact from her supervisor.

6. The United States Equal Employment Opportunity Commission, issued a notice of right to sue letter on November 18, 2014.

## PARTIES

7. Plaintiff Lisa Stark is a female over the age of twenty-one (21) and a resident of Montgomery County in the State of New York.

8. Defendants The Noteworthy Company and/or Noteworthy Industries, Inc. are a closely held corporation that is a manufacturer of promotional products. Their products include bumper stickers, nonwoven totes, notepads, plastic bags, folders, coloring books, yard signs and more. They maintain an office and principal place of business at 336 Forest Avenue, Amsterdam, New York 12010.

9. At all times relevant to this complaint, defendants employed plaintiff as the operator of a printing machine.

10. Plaintiff was supervised by Billy Wilmot, an employee of defendants.

11. Plaintiff and others called the wrongdoing of Billy Wilmot to the president of the defendants Anthony Constantino, who, together with others, supervised Mr. Wilmot.

## FACTUAL ALLEGATIONS

12. On June 8, 2012, plaintiff started working for defendants at their manufacturing facility located at 336 Forest Avenue, Amsterdam, New York 12010

13. Plaintiff began working on first shift (6:00 AM – 2:00 PM). Her supervisor was Billy Wilmot.

14.     On or about June 22, 2012, Mr. Wilmot started to make sexual comments to plaintiff.

15.     Mr. Wilmot would comment on how large her breasts were. When plaintiff would go to him with questions regarding work, he would tell her that to get an answer she should flash him.

16.     When plaintiff needed help lifting heavy items at work, she would go to male co-workers for assistance. Mr. Wilmot would tell the male co-workers that they should only help her if she showed them her breasts or squeezed her breasts together.

17.     Every time Mr. Wilmot would make these comments, plaintiff would ask him to stop. He only laughed.

18.     In or about late June 2012, Mr. Wilmot made a comment to plaintiff stating that he would like to "motor boat" her breasts and her buttocks. He would talk about this in front of male co-workers.

19.     Mr. Wilmot made comments about plaintiff and a female co-worker, Jasmine Rivera. Ms. Rivera is a lesbian. Mr. Wilmot would make comments to Jasmine, such as, "I bet you would like to rub your face all over Lisa's breasts," and "Why don't the two of you get it on so I can watch."

20.     In or about early July, 2012, when Mr. Wilmot approached plaintiff, he would get very close to her face and tell her that she was sexy and smelled really good. He said plaintiff smelled so good that he wanted to eat her. This became an everyday comment to plaintiff.

21.     In or about mid July, 2012, plaintiff bent down to pick up a sheet of paper that she had dropped and did not notice that the printer repairman was fixing the printer. Mr. Wilmot was there and made a comment to the repairman that he almost got plaintiff's butt rubbed in his face.

22.     In or about the end of July, 2012, comments from Mr. Wilmot regarding plaintiff's breasts and buttocks continued.

23. A woman from Customer Service, Terri Moore, came down to the area where plaintiff worked. After she walked away, Mr. Wilmot made a comment to plaintiff that the only good thing about her was she would give good blow jobs, and that he loved to watch her walk when she had a low cut shirt on.

24. In early August, 2012, Mr. Wilmot's comments about wanting to eat plaintiff began to get worse. Plaintiff despised going to work because of his comments. He began to call her over to his desk often during the day. When she went to his desk, he would make comments such as that he thought she looked sexy and that her breasts looked nice in the shirt she was wearing.

25. At about that time, plaintiff contacted information technology and asked that they set her up with email and internal chat. This way she would not have to go to Mr. Wilmot's desk; they could use the internal chat instead.

26. In or about mid-August, 2012, Mr. Wilmot hired a female worker. Plaintiff was responsible for training her.

27. After the new worker was trained, in or about late August, 2012, plaintiff was moved to second shift (2:00 PM – 10:00 PM). Mr. Wilmot was also moved to second shift. Once they were moved to second shift, Mr. Wilmot's sexual remarks became even more frequent than when they were on first shift.

28. While on second shift, Mr. Wilmot would tell plaintiff that he would not answer any of her questions unless she flashed him.

29. In or about early September, 2012, Mr. Wilmot's sexual comments continued. Plaintiff verbally asked him several times to stop. He did not. Plaintiff told him that she was going to tell the President Anthony Constantino. Mr. Wilmot told her that Mr. Constantino hated her, would never believe her, and would fire her if she complained.

30. Mr. Wilmot's sexual comments continued through September even though plaintiff repeatedly asked him to stop. He continued to tell her that the President, Mr. Constantino, and Vice President Lynette Cooling hated her, and that, if she complained to either one of them, she would be fired.

31. During the month of October, 2012, plaintiff continued to work on second shift. Whenever she had a question for Mr. Wilmot, his reply was always: "I will answer you only if you flash me." He would tell her to call or text him if she had a problem with any of the machines when he was not at work, although he added that he would only answer if she sent him a pornographic picture of herself.

32. In or about the beginning of November, 2012, plaintiff was still on second shift. Mr. Wilmot told her that she would never go back to first shift because the President Mr. Constantino did not like her. He also said that plaintiff better not ask Mr. Constantino about it or he would fire her.

33. Plaintiff was told by Mr. Constantino in or about early November, 2012, that the company needed her to stay on second shift because she was reliable, trustworthy, and a great worker.

34. In or about mid November 2012, plaintiff complained to Tim Knights, a third shift supervisor, about Mr. Wilmot's sexual comments and harassment.

35. Mr. Knights reported plaintiff's concerns to Mr. Constantino. Mr. Constantino then came to discuss the matter with her.

36. Plaintiff told Mr. Constantino about the details of Mr. Wilmot's sexual comments and harassment. Mr. Constantino replied: "he [Mr. Wilmot] is a horny bastard." Mr. Constantino asked her to attend a sexual harassment meeting. Plaintiff told him that she would attend. This meeting was never scheduled.

37. After speaking with Mr. Constantino and expressing her concerns about the sexual harassment, he told plaintiff that he would take care of Mr. Wilmot.

38. On Monday, November 26, 2012, plaintiff was transferred from the sticker department, working as a printer, to the poly department to work as a machine operator.

39. The work as a machine operator in the poly department required heavy lifting. Plaintiff knew she would be unable to meet the work expectations of that position and would not be able to meet the quotas of that department because she was not able to do the heavy lifting required. Plaintiff advised Mr. Constantino accordingly.

40. Plaintiff asked Mr. Constantino why she was transferred. He told her that it was because it was slow in the sticker department. That was untrue. When plaintiff was in that department, several co-workers and plaintiff worked 6 to 7 days per week to meet the demands of the customers.

41. Plaintiff told Mr. Constantino that in her view he only transferred her because she complained about the sexual harassment from Mr. Wilmot. Mr. Constantino did not respond.

42. On Tuesday, November 27, 2012, plaintiff again expressed her concerns to Mr. Constantino that she was unable to do the job in the poly department due to the physical demand associated with the position.

43. Later that day, Tuesday, November 27, 2012, plaintiff was laid off.

44. Two new people have been hired in the sticker department since plaintiff was told there was not enough work for her.

45. Plaintiff was a victim of sexual harassment and was further retaliated against because she made a complaint of sexual harassment.

## COUNT I

46. Plaintiff repeats and realleges each of the allegations in each of the foregoing paragraphs of the complaint.

47. Mr. Wilmot repeatedly subjected plaintiff to unwelcome sexual remarks and conduct.

48. Plaintiff was the victim of a hostile work environment on the basis of her gender.

49. Mr. Wilmot's unwelcome conduct was so severe and pervasive that it unreasonably interfered with plaintiff's ability to do her job effectively.

50. Mr. Constantino failed to take prompt and effective remedial action to stop the sexual harassment.

51. Transferring her to a job in the poly department was not prompt and effective remedial action, as it punished plaintiff by giving her a position that was much more difficult for her to do.

52. Defendants are liable for the acts of Mr. Wilmot under the doctrine of *respondeat superior*.

53. The acts of defendants, through their employee Mr. Wilmot, constitute sexual harassment and unlawful discrimination against plaintiff on the basis of her gender in violation of Title VII.

## COUNT II

54. Plaintiff repeats and realleges each of the allegations in each of the foregoing paragraphs of the complaint.

55. Mr. Constantino, rather than remedying the sexual harassment, retaliated against plaintiff by transferring her to a more difficult position.

56. Such action constitutes unlawful retaliation in violation of Title VII.

## COUNT III

57. Plaintiff repeats and realleges each of the allegations in each of the foregoing paragraphs of the complaint.

58. The acts of defendants, through their employee Mr. Wilmot, constitute sexual harassment and unlawful discrimination against plaintiff on the basis of her gender in violation of the New York State Human Rights Law.

## COUNT IV

59. Plaintiff repeats and realleges each of the allegations in each of the foregoing paragraphs of the complaint.

60. Mr. Constantino, rather than remedying the sexual harassment, retaliated against plaintiff by transferring her to a more difficult position.

61. Such action constitutes unlawful retaliation in violation of of the New York State Human Rights Law.

## COUNT V

62. Defendants' actions were intentional, wanton, willful, reckless, and malicious, and demonstrated utter and heedless disregard for plaintiff's right to be free from sex discrimination in the workplace. In particular, Mr. Constantino showed marked insensitivity to a person in plaintiff's position.

63. Plaintiff is entitled to punitive damages from defendants.

WHEREFORE, plaintiff seeks a Judgment against defendants, ordering, adjudging, and decreeing that:

A. Defendants violated Title VII and/or the New York State Human Rights Law.

B. Defendants shall reimburse plaintiff for all loss of back pay, loss of benefits (including severance benefits), loss of savings, loss of earning capacity ("front pay"), and other monetary losses she has suffered as a result of defendants' conduct.

C. Defendant shall pay plaintiff compensatory damages for the pain, suffering, emotional harm, loss of enjoyment of life and other harm suffered by plaintiff as a result of defendants' conduct.

D. Defendant shall pay punitive damages to plaintiff.

E. Defendant shall pay the costs, disbursements, expenses, and reasonable attorneys' fees incurred by plaintiff in the prosecution of this action.

F. Plaintiff shall be awarded such other and further relief as the Court deems appropriate.

Dated: Albany, New York
   February 2, 2015

            COOPER ERVING & SAVAGE LLP
            39 North Pearl Street
            Albany, New York  12207
            (518) 449-3100


            By: *s/ Phillip G. Steck*
               Phillip G. Steck (102664)

215168